IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                              Cr. No. 18-2041 KG

FRANCISCO YBARRA CRUZ,

     Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendant's Motion to Suppress Evidence and Statements, filed July 19, 2018. (Doc. 16). The United States responded on August 8, 2018. (Doc. 25). On August 16, 2018, the Court held an evidentiary hearing on the Motion. Assistant United States Attorney Mark Saltman appeared for the United States, and Assistant Federal Public Defender Bernadette Sedillo appeared on behalf of Defendant Francisco Ybarra Cruz, who was present. Having considered the briefing, the oral arguments of counsel, the applicable law and the evidence, the Court denies the Motion.

*I.*    *Procedural Background*

This case originated on March 26, 2018, when the United States filed a Criminal Complaint alleging that Cruz violated 21 U.S.C. § 841(a)(1) by knowingly or intentionally possessing with intent to distribute approximately 11.5 pounds of methamphetamine. (Doc. 1). On June 20, 2018, the United States filed an Indictment charging Cruz in Count 1 with distribution of 500 grams or more of methamphetamine in violation of 21 U.S.C. § 846, and in Count 2 with possession with intent to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and 18 U.S.C. § 2. (Docs. 10 and 11).

The evidence includes that the methamphetamine was seized, and inculpatory statements made, on March 24, 2018. At the August 16, 2018, hearing, Department of Homeland Security Special Agent Fernando Lozoya ("Agent Lozoya"), and New Mexico State Police Department Officer Leo Palomares ("Officer Palomares") testified. The Court admitted the United States' exhibits without objection. The Court heard oral argument from both parties.

II.    *Findings of Fact*

Agent Lozoya is an agent with the Department of Homeland Security. Tr. at 7.[1] He has worked for the Department of Homeland Security for thirteen years, and has been stationed in Las Cruces for the past four years. *Id.* at 8. Agent Lozoya has worked with a Confidential Source ("CS") since 2016, finding that he has provided reliable and credible information. *Id.* at 9. The CS's information related to an investigation surrounding the importation of methamphetamine from Mexico to Phoenix, Arizona. The CS's information resulted in previous seizures of methamphetamine. *Id.* at 9-10.

At approximately 4:00 p.m., on Saturday March 24, 2018, Agent Lozoya received a call from the CS who told Agent Lozoya that he ordered about ten pounds of methamphetamine. *Id.* at 10. The CS informed Agent Lozoya that the methamphetamine would be in a vehicle located in Las Cruces in the area of Interstate 10, exit 139, and Motel Boulevard. *Id.* Agent Lozoya testified the vehicle was traveling from Arizona. *Id.* The CS did not provide a description of the vehicle the individual was driving. *Id.* at 29. When Agent Lozoya arrived near exit 139, he noticed several vehicles with Arizona license plates and, without further information, could not discern which vehicle the CS was talking about. *Id.* at 10.

---

[1] The Court's citation to the hearing transcript refers to the court reporter's original unedited version. Any final transcript may contain slightly different page and/or line numbers.

At approximately 5:30 p.m., the CS told Agent Lozoya that the vehicle was in the area of Boutz and El Paseo Rds. in Las Cruces.  *Id.* at 11.  The CS also told Agent Lozoya that the individual transporting the methamphetamine mentioned to the CS that he was with his family.  *Id.*  Agent Lozoya went to the intersection and started looking for a vehicle with an Arizona tag with a family, driving around the area.  He located a white pickup truck with an Arizona license plate at the corner of Montana Ave. and El Paseo Rd., approximately one mile from the Boutz intersection.  *Id.* at 12.  He also noticed the white pickup truck had an attached tow dolly, and an Hispanic male working on the vehicle.  *Id.*  This male was later identified as Cruz.  *Id*. at 14.

Agent Lozoya continued to surveil the white pickup truck from his position at a nearby Sonic Drive-In, observing the male work on the front of the pickup truck in an empty parking lot.  *Id.* at 11-13.  Around this time, Agent Lozoya noticed a black Ford pickup truck stop where Cruz was located, and Agent Lozoya noticed a female and a young Hispanic male in the black Ford pickup truck.  *Id.* at 13.  After talking to Cruz for a few minutes, the female and young Hispanic male traveled in the black Ford pickup truck to the Sonic Drive-In and pulled into the parking space next to Agent Lozoya.  *Id.*  According to Agent Lozoya, the black Ford pickup truck remained parked for a few minutes, though it appeared the driver and passenger did not order anything from the restaurant.  Agent Lozoya then observed the black Ford pickup truck return to the empty parking lot where Cruz was located.  *Id.* at 13-15.  Agent Lozoya also noticed that the black Ford pickup truck had a Kansas license plate.  *Id.* at 14.

As a result of these observations, Agent Lozoya contacted Officer Palomares, and informed Officer Palomares of the information he had and asked for Officer Palomares' assistance with a traffic stop of Cruz's white pickup truck.  *Id.* at 16.  Specifically, Agent Lozoya told Officer Palomares that he had information from a CS of a male delivering

methamphetamine, driving a white pickup truck with an Arizona license plate. *Id.* at 16-17. Agent Lozoya testified that he had worked with Officer Palomares before. *Id.* at 16.

After the female and young male returned to the empty parking lot where Cruz was located, they all departed in the two pickup trucks, traveling approximately two miles north to an O'Reilly's Auto Parts ("O'Reilly's"). *Id.* at 15-16. Agent Lozoya continued his surveillance, parking in an AutoZone store across the street from the O'Reilly's. *Id.* at 18. Agent Lozoya observed Cruz working on one of the pickup trucks. *Id.* at 19.

At this time, Agent Lozoya contacted the CS, instructing the CS to inform his source that the drug transaction could not be completed that day, but that it could be done the next day. *Id.* at 17. Agent Lozoya also instructed the CS to ask the source where he was located at that time. *Id.* The CS called Agent Lozoya, stating the source said he was currently at the O'Reilly's parking lot. *Id.* at 17-18.

From approximately 6:00 p.m. to approximately 8:00 p.m., Agent Lozoya surveilled the individuals at the O'Reilly's parking lot. *Id.* at 19. Cruz had attached the black Ford pickup truck to the dolly attached to the white pickup truck, so that the white pickup truck was towing the black Ford pickup truck. *Id.* at 20. At around 7:30 p.m., the CS told Agent Lozoya that Cruz needed to leave Las Cruces quickly to go to Kansas and pick up a vehicle that he left there the previous week, so Cruz wanted to complete the drug transaction. *Id.* at 19. The drug transaction was never completed. *Id.* at 23.

Agent Lozoya then observed Cruz and his family leave the O'Reilly's parking lot in the white pickup truck, towing the black Ford pickup truck, and pull into a Walmart near Valley Drive. *Id.* at 20. Agent Lozoya followed Cruz and his family to the Walmart, where Agent Lozoya was then joined by Department of Homeland Security Special Agent Joey Rodriguez

("Agent Rodriguez"). *Id.* at 20-21. Cruz and his family stayed at the Walmart for about an hour. *Id.* at 21. At approximately 9:00 p.m., Cruz and his family left the Walmart and headed back to the O'Reilly's parking lot. *Id.* Cruz and his family were at the O'Reilly's parking lot for about ten to fifteen minutes before heading to the Albertsons further north on El Paseo Rd. *Id.* Agent Lozoya observed Cruz adjust the tow hitch before he and his family got back onto the road and headed towards Interstate 25 ("I-25"). *Id.*

During this time, Agent Lozoya and Agent Rodriguez kept constant surveillance of Cruz, never losing sight of the white pickup truck towing the black Ford pickup truck. *Id.* at 22. Also during this time, Agent Lozoya kept Officer Palomares informed of the surveillance, providing updates on his location and anticipating where Cruz was headed so that Officer Palomares could conduct a traffic stop. *Id.* Agent Lozoya informed Officer Palomares that Cruz was in a white pickup truck pulling a black pickup truck, and informed Officer Palomares that the black pickup truck had a Kansas license plate. *Id.* at 44-45.

As Cruz and his family approached I-25, Agent Lozoya contacted Officer Palomares, and informed him of Cruz's whereabouts and that he was about to enter the Interstate. *Id.* at 23 and 45. Agent Lozoya instructed Officer Palomares to stop Cruz for any visible traffic violations. *Id.* at 44.

Officer Palomares was driving from Highway 70 to I-25 when he located the white pickup truck. *Id.* at 51. Officer Palomares confirmed the Kansas license plate on the black pickup truck. *Id.* at 51-52. Officer Palomares did not see any other white pickup trucks on I-25 while he was following Cruz. *Id.* at 52. Officer Palomares testified that the traffic was slow and Cruz was driving about ten to fifteen miles per hour under the speed limit. *Id.*

Around 9:40 p.m., Officer Palomares observed the white pickup truck and towed black pickup truck straddle the dotted line separating the right lane of the Interstate from the Doña Ana exit lane. *Id.* at 55. Officer Palomares testified that about a quarter of the width of the vehicles straddled the line. *Id.* at 106. About a minute later, Officer Palomares initiated his emergency lights and pulled Cruz over to the right shoulder. Government Exhibit 4. After making contact with Cruz, Officer Palomares issued Cruz a warning citation for violating NMSA 1978, Section 66-7-317(A) (Repl. Pamp. 2004). Tr. at 59-60; Government Exhibit 5. Officer Palomares continued his investigation, asking Cruz and his wife questions about their travels. Tr. at 61. They gave inconsistent responses to Officer Palomares' questions. *Id.* at 88-90. Officer Palomares continued his investigation, including a dog sniff resulting in the discovery and seizure of the methamphetamine.[2] *Id.* at 62.

Cruz challenges the lawfulness of the traffic stop, contending Officer Palomares lacked reasonable suspicion to conduct the traffic stop.

III.    *Analysis*

"The purpose of a suppression hearing is 'to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments.'" *United States v. Maurek*, 131 F. Supp. 3d 1258, 1261-1262 (W.D. Okla. 2015) (quoting *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982)). "The proper inquiry is whether [the challenged action] violated the Fourth Amendment rights of [the] criminal defendant making the challenge." *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000)

---

[2] Agent Lozoya arrived at the stop after Officer Palomares conducted the dog sniff. Tr. at 34-35. Agent Lozoya and Agent Rodriguez made contact with Cruz and advised him that he would be taken to the Department of Homeland Security Office in Las Cruces for further investigation and interviews. *Id.* at 25. The Agents read Cruz his *Miranda* Rights, which Cruz waived, and then provided an inculpatory statement. *Id.* Cruz does not argue that his consent to the dog sniff or his waiver of *Miranda* rights was coerced.

(quoting *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989)). "The proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search." *United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009) (quoting *Allen*, 235 F.3d at 489). The United States bears the burden of proof by the preponderance of the evidence to show that the challenged action did not violate the defendant's Fourth Amendment rights. *United States v. Matlock*, 415 U.S. 164, 177 (1974). Finally, the Court views the evidence in the light most favorable to the United States. *See, e.g., United States v. Turner*, 2013 WL 5727404, at *9 (D. Kan.) ("While the Court is cognizant that it must view the facts in the light most favorable to the Government, it may not draw inferences that are not supported by the record, nor accept facts that are contrary to the record."); *United States v. Ortega*, 2012 WL 12894242, at *4 (S.D. Fla.) ("viewing the facts adduced at the suppression hearing in the light most favorable to the government….").

### A. *Fourth Amendment Standard on Traffic Stops*

The Fourth Amendment guarantees individuals the right to be free from unreasonable searches and seizures of their person and property. U.S. Const. amend. IV. "A traffic stop for a suspected violation of law is a seizure of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." *Heien v. North Carolina*, 135 S.Ct. 530, 536 (2014) (internal quotation marks and citation omitted). "To justify a traffic stop, an officer needs 'only reasonable suspicion—that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law.'" *United States v. Vance*, 893 F.3d 763, 773 (10th Cir. 2018) (quoting *Heien*, 135 S.Ct. at 536). "Whether reasonable suspicion exists is an objective inquiry determined by the totality of the circumstances." *United States v. Salas*, 756 F.3d 1196, 1201 (10th Cir. 2014) (citation omitted).

In the event law enforcement officers violate the commands of the Fourth Amendment, the exclusionary rule applies which "forbids the use of improperly obtained evidence at trial." *Herring v. United States.*, 555 U.S. 135, 139 (2009) (citing *Weeks v. United States*, 232 U.S. 383, 398 (1914)). The exclusionary rule "is designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Id.* at 139-140 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

### B. Reasonable Suspicion to Stop Cruz's White Pickup Truck

#### 1. Reasonable Suspicion Based on Agent Lozoya's Surveillance and Communication with Confidential Source

"Under the collective knowledge doctrine, the officer who makes the stop need not have reasonable suspicion that criminal activity is afoot." *United States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012). "Instead, the knowledge and reasonable suspicions of one officer can be imputed to another." *Id.* (citing *United States v. Chavez*, 534 F.3d 1338, 1345-1346 (10th Cir. 2008)). "The collective knowledge doctrine has two categories—horizontal and vertical." *Id.* (citation omitted). "Under the vertical collective knowledge doctrine, an arrest or stop is justified when an officer having probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action." *Id.* "Thus, an officer with reasonable suspicion may instruct another officer to make a *Terry* stop without communicating the basis for the stop, so long as the communicating officer has reasonable suspicion to make the stop himself." *Id.*

Here, the United States argues that Agent Lozoya had reasonable suspicion to believe that Cruz was trafficking methamphetamine based on information from the CS and Agent Lozoya's observations of Cruz. Agent Lozoya testified extensively about his communications with the CS, much of which he was able to corroborate through his own surveillance of Cruz. First,

Agent Lozoya noticed that the white pickup truck had an Arizona license plate which matched the CS's report that the methamphetamine would be coming from Arizona. Second, Agent Lozoya witnessed Cruz near El Paseo and Boutz Rds. around the time the CS informed him that Cruz would be at that intersection. Third, Agent Lozoya saw Cruz with a female and a young child, corroborating the CS's report of a family. Fourth, after Agent Lozoya had surveilled Cruz for some time, the CS called him to tell him that Cruz would be at an O'Reilly's near El Paseo and Boutz Rds., which Agent Lozoya confirmed in real time. Fifth, Agent Lozoya noticed that the black Ford pickup truck had a Kansas license plate which corroborated the CS's statement that his source was traveling to Kansas to pick up a vehicle. In addition to these corroborations, Agent Lozoya worked with the CS since 2016 resulting in several successful orders of methamphetamine, thus proving the CS's reliability. Considering the totality of the circumstances, the Court finds that Agent Lozoya had reasonable suspicion to believe that Cruz was trafficking methamphetamine through Las Cruces.

Therefore, under the collective knowledge doctrine, Agent Lozoya's reasonable suspicion is "vertically" imputed to Officer Palomares. In other words, Officer Palomares' stop of Cruz was justified under the Fourth Amendment because Agent Lozoya had reasonable suspicion to believe Cruz was engaged in illegal activity when he called Officer Palomares and instructed Officer Palomares to stop Cruz for any traffic violation.

> *2. Failure to Maintain a Traffic Lane in Violation of NMSA 1978, Section 66-7-317(A)*

Under Section 66-7-317(A), "[w]henever any roadway has been divided into two or more clearly marked lanes for traffic… a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." In construing this statute, the New Mexico Court

of Appeals has held that "the plain language of Section 66-7-317(A)—including the 'as nearly as practicable' qualification—recognizes and contemplates circumstances under which a driver may momentarily leave his or her lane of travel without violating the statute." *State v. Siqueiros-Valenzuela*, 2017-NMCA-074, ¶ 18. The "'as nearly as practicable' qualification 'require[s] a fact-specific inquiry into the particular circumstances present during the incident in question to determine whether the driver could reasonably be expected to maintain a straight course at that time in that vehicle on that roadway.'" *Id.* ¶ 19 (quoting *United States v. Alvarado*, 430 F.3d 1305, 1309 (10th Cir. 2005)). "This totality of the circumstances analysis takes into account whether there were any weather conditions, road features, or other circumstances that could have affected or interfered with a driver's ability to keep his or her vehicle in a single lane." *Id.* (citing *Alvarado*, 430 F.3d at 1309).

Considering the totality of the circumstances here, Officer Palomares had reasonable suspicion to believe Cruz failed to drive as nearly as practicable entirely within the right lane of the Interstate. Officer Palomares witnessed Cruz straddle the dotted line for a few seconds, with about a quarter of the width of the trucks over the dotted line. Cruz has failed to point to any weather conditions, road features, or other circumstances that would have affected or interfered with his ability to keep his vehicle in a single lane. Moreover, the video evidence does not show any weather conditions or road obstructions that would have required Cruz to straddle the dotted line between the Doña Ana exit and the right lane of the Interstate.

Nevertheless, Cruz argues that he did not violate Section 66-7-317(A) because he was driving a pickup truck that was towing a second pickup truck at night. While this description is supported by the record, it fails to show why Cruz could not have maintained his lane, especially since he was driving ten to fifteen miles per hour under the speed limit. Both before the Doña

Ana exit and after, Cruz maintained his lane, and so, evidently, it was not impossible for him to maintain his lane. In his briefing, Cruz asserts he was unfamiliar with I-25 and that he confused the exit lane with a third lane, and upon realizing his mistake he "safely and feasibly executed" a maneuver into the right lane of the Interstate. The United States does not contend that Cruz created any dangerous condition by straddling the dotted line, instead it argues that if he thought the exit lane was a new lane he would have moved entirely into the exit lane or he would have used his signal showing his intention to move right. The Court finds Cruz's unfamiliarity argument unpersuasive, primarily because he straddled the line rather than moving entirely into the exit lane believing it to be a new lane. Thus, under the totality of the circumstances, Officer Palomares had reasonable suspicion to believe Cruz violated Section 66-7-317(A).

### 3. Reasonable Mistake of Law

Assuming *arguendo*, that Officer Palomares did not have reasonable suspicion to stop Cruz for failure to maintain his lane in violation of Section 66-7-317(A), Officer Palomares, nonetheless, acted reasonably under the Fourth Amendment. In *Heien v. North Carolina*, the United States Supreme Court held that "reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition." 135 S. Ct. 530, 536 (2014). The Court noted that "[t]o be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). The mistake of law analysis can apply when a case involves an ambiguous statute. *See id.* (Kagan, J., concurring) (stating "the test is satisfied [only] when the law at issue is so doubtful in construction that a reasonable judge could agree with the officer's view"); *but see United States v. Stanbridge*, 813 F.3d 1032, 1037 (7th Cir. 2016) (noting statute in case unambiguous "and

*Heien* does not support the proposition that a police officer acts in an objectively reasonable manner by misinterpreting an *unambiguous* statute." (emphasis in original)).

In this case, the case law construing Section 66-7-317(A) and other similar statutes demonstrate the fact-specific, totality of the circumstances approach an officer must perform in determining whether there is a failure to maintain a lane. *Compare Siqueiros-Valenzuela*, 2017-NMCA-074, ¶ 22 (affirming district court's grant of motion to suppress when defendant passed two semi-trucks while driving seventy to seventy-file miles per hour on interstate and briefly touched left-hand yellow shoulder line), *and United States v. Gregory*, 79 F.3d 973, 978 (10th Cir. 1996) (reversing district court's denial of motion to suppress and finding no violation of Utah's failure to maintain lane statute when defendant moved into right shoulder of winding road in mountainous terrain and in windy weather), *with Alvardo*, 430 F.3d at 1309 (affirming district court's denial of motion to suppress when defendant crossed one foot over fog line in violation of Utah failure to maintain lane statute and no weather conditions, road features or other circumstances justified violation). Officer Palomares observed Cruz straddle the dotted line for a few seconds, and he testified that about a quarter of the width of the vehicle was over the dotted line into the exit lane. Officer Palomares also testified that the weather was clear, the roads were clear and there was no debris on the roadway. Thus, even if Cruz did not violate Section 66-7-317(A), Officer Palomares acted reasonably in determining Cruz failed to maintain his lane in violation of the statute.

IV. *Conclusion*

For the above reasons, the Court determines that neither Officer Palomares nor Agent Lozoya acted unreasonably under the Fourth Amendment. Accordingly, the Court denies Cruz's Motion to Suppress Evidence and Statements (Doc. 16).

IT IS SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE